Mr. Fraihat. And this one, get the number. This one is 187. So we'll begin with that one. Good morning, counsel. Good morning. I may have pleased the court. Jerome Mayorkin, too, for Mr. Fraihat. With the court's permission, I hope to reserve two minutes of my time for rebuttal. Do you, sir? Yes, Your Honor. And I will keep an eye on the clock. I hope to discuss three issues today. The first relates to Mr. Fraihat's conviction for manufacturing methamphetamine. The second relates to his conviction for possessing a controlled substance for sale. The third issue is somewhat independent, which is whether or not he was entitled to relief under the Convention Against Torture. So when it comes to- Before you get to those, because they're all merits issues, can you tell me how you deal with the exhaustion issue under 11379.68? That's a big deal from my perspective. How do you deal with that? I understand, Your Honor. And I do recognize that if you look at the statement in Mr. Fraihat's brief before the BIA in isolation, that would make my job very difficult today. But it's interesting as to what happened afterwards, because the BIA said- You kept a little bit. Oh, excuse me. You're being recorded for posterity, and you want your mother to be able to hear you. Indeed, I do, Your Honor. OK. So if she's listening, I'll say that what happened is that the BIA cited matter of Burbano. And that is shorthand, a shorthand way of saying that it considered all of the issues considered by the immigration judge, which includes the methamphetamine claim. And so as an en banc panel of this court decided in Abebe versus Gonzalez, when that happens, the issue is preserved for this court's review, regardless of what arguments the petitioner did or did not make. I mean, Abebe describes it as, as I read it, as something of a default rule. I mean, we said where the BIA cites Burbano and does not express disagreement with any part of the IJ's decision. So Burbano is sort of a shorthand. We're adopting the whole thing. But here, the board explicitly said that because the respondent has not contested these determinations on appeal, these issues are waived. So doesn't that negate the inference that they're adopting what the IJ said? They're saying we're not going to consider it because it's waived. My response would be twofold, Your Honor. So first, I would say that I think the BIA is, in some sense, trying to have it both ways, saying that we considered everything and also that we didn't. But I would also add that there is an underlying change in law. And that's due to two cases. Verdusco-Rangel was decided after our brief was submitted, or Mr. Fryhoff's brief was submitted to the BIA. And then this court's decision in Luque-Rodriguez really indicated that the window is still open here. And there is an unresolved question. Does Your Honor have a question? Oh, I wasn't well-made. Since you asked, I mean, Luque-Rodriguez, I mean, maybe you could explain how that helps you. Because even setting aside the fact that it's unpublished, Luque-Rodriguez rejected a claim similar to this one. So it doesn't seem to me to be a change in the law that would help you. That's correct. I think that really what it did was reaffirm that the theory articulated by this court in Verdusco-Rangel as to the overbreadth of California's manufacturing statute really does indicate that there is an unresolved question here. That was not clear at the time that Mr. Fryhoff wrote his and submitted his BIA brief. Now, I'm happy to address the merits of this case, but I think that this court, the manufacturing claim, but I think that this court does understand the theory articulated in Verdusco-Rangel, which is that California criminalizes a broader swath of conduct than its federal counterpart does. If the court has no questions on this issue. Again, I would just say, and I think my colleagues kind of articulated that as well, that I don't find ABEBE to solve your problem. And because the statute that you're dealing with, and whether it's a categorical match and so on, may not have been adequately raised and is unexhausted, to me that's a really serious problem for your client. You don't have to say anything more about it, but if you can do any more to help rehabilitate that aspect, it would be helpful to me. Your Honor, I guess that the only additional thing I could say is that this is a purely legal issue that this court would decide without reference to or deference to the agency's proceeding. And so I think that the- Wait a minute. With respect, as my colleague has just indicated, the BIA specifically said, he didn't talk about this, so we're not going to get into it. In effect, it's not exhausted. I understand, Your Honor. We have to refer to that. That's where this whole thing comes from, right? I do understand. And so I think at this point, I will take Your Honor's invitation to no longer say anything more about this, because at this point, even if I'm wrong and this issue was not preserved below, Mr. Freiheit can seek relief under the Convention Against Torture. And that relief deferral under the Convention Against Torture is independent of the first two issues. So let me then turn to the many errors that the BIA committed when it undertook this analysis. Though we raised several in our brief, I'd like to really focus on three today. The first is that the BIA approvingly cited the immigration judge's declaration that there are no, excuse me, that there is no noted circumstance of violence or torture against Christian converts. And that's flatly incorrect. As the government admits on page 13 of its brief, Christian converts are subject to honor killings. And under Parada v. Sessions, killings are torture. Is it your position that regardless of the general conditions in the country and the fact that the government is generally opposed to the honor killings you're talking about, if there are honor killings, that's enough to weigh in favor of your client? Yes, Your Honor. For the same reasons articulated by this court in Cerati v. Holder. And I think that, to give a very precise answer, is that yes, private killings, honor killings by private individuals can constitute torture if there is government acquiescence. Does that mean, and I don't mean to try to be pejorative or anything like that, but even in our country here today, there are young women who have been killed for honor killings. I've seen no evidence that the government cooperates with that, but does that mean that someone, if there were such a treaty applying to our country, and I think there is, that they could get cat relief in, say, France because of honor killings in the United States? I think that the answer is no. And what distinguishes the country of Jordan from our country, among other things, is that conversion from the Islamic faith to the Christian faith is, in many circumstances, deemed a crime that can be punished for two years. And I think that would draw the critical distinction. That's under Sharia law, I think, is it not? So if you had, and again, I'm no expert on this, but my understanding is that in certain parts of our country where there's a substantial group of people who believe in, follow Sharia law, that there have been instances of conversion where people have been killed for their conversion. Perhaps I'm mistaken, but let's just say, arguendo, say that has happened. Based on what you're saying, would the United States be, would our country be sufficiently insecure that someone seeking cat relief elsewhere could not, could get it, basically? The answer is no, again, Your Honor. And let me draw another distinction, which is that, unlike the United States, there is evidence here that the Jordanian government routinely practices torture. And the Department of State's own report in this case, which can be found at AR 842, states that converts to the Christian faith are routinely interrogated, and that in interrogation, Jordanian police forces routinely use torture. So I think that draws a fairly stark distinction between the United States system and the Jordanian system. But does that argument, I mean, is the evidence of torture in Jordanian interrogations specific to interrogations involving conversions, or is it just, that's just the general police practice? I'm afraid that it is the general police practice. So if someone were, if the claim were, I'm likely to be investigated by the Jordanian police for something having nothing to do with religion or politics, but ordinary criminal conduct. Would anyone facing a Jordanian police investigation have a viable cap claim? I think the answer is no, and that would be a much more difficult case to argue, Your Honor. But here we have a circumstance where Mr. Freyhat has been subjected to repeated death threats. So we're not relying solely on background country evidence. We've got two death threats, one from an unnamed member of ISIS, and then, excuse me, a more specific one from members, identified members of his family. And I think that's the second error that the BIA committed here by disregarding this evidence. And the government seems to argue in its brief that whoever made the threat from ISIS should have done so on signed letterhead. But unfortunately, this court has said in Aguilaricota that terrorists who make these sorts of threats cannot be expected to follow such arbitrary evidentiary rules. I'll also point out that the government seems to ask this court to disregard the earlier threat that the agency, the earlier threat that he testified about in the first stage of his immigration proceedings. But let me first note that that is contrary to 8 CFR 1208.16 C3, which says that the agency must consider all relevant evidence. And I will point out that the government, the agency deemed that testimony credible. So there is really no basis for the agency to disregard it simply because it happened earlier along. But how does the, I mean, there's no evidence that the Jordanian government is supportive of or even acquiescing in the activities of ISIS, is there? So how does an ISIS threat help you get to the connection to the government that you need? Well, there's not just simply the ISIS threat, though I do believe that our brief puts forward evidence that it's an increasing problem. But I would really highlight the honor killing from the family. And this is the exact situation that this court dealt with in Cerati versus Holder. Of course, that case is unpublished and it's merely persuasive. But what it did say is that the Jordanian government, even though it prosecutes honor killings, that would be cold comfort for those who are actually murdered. And that what's the relevant question is whether the government does enough to prevent these sorts of killings. And for the same reasons that this court relied upon in Cerati, this court should conclude that there is insufficient evidence that the Jordanian government does enough to prevent these. As the UNHCR report states, there are honor killings and that the government has a, quote, permissive attitude towards those. And I think that by disregarding this evidence, the BIA committed error. I guess what I struggle with is that if it's ISIS, that's one thing. And my colleague has addressed that a little bit. But with respect to the family, are you saying that under our case law, that if a family member threatens, in this case, Mr. Fryhat, with death because he converted to Christianity, that the Jordanian government, in order to avoid the stigma of not being sufficiently active, would have to seek out the family member and prosecute them? Is that your position? I think that the evidence does show here that there is a permissive attitude. And yes, that is. What does that mean? I think that what it means is what it meant in Cerati and also what it meant in Parada versus Sessions, where the BIA committed the same error by defining acquiescence too narrowly. What case would you rely upon that you think is close to being on all fours with this one on this cat issue as possible? I think that the Cerati case is the most persuasive. I understand that it's only persuasive. And so I would cite also to Parada, which is also a case where the BIA erred by defining acquiescence too narrowly. You wanna save your time? I will save my time. Thank you very much. Very well. Hear from the government. Thank you. Good morning. Good morning, your honors. May it please the court, Rebecca Nahas for the United States Attorney General. I wanna start off by clarifying the government's position with regard to petitioner's manufacturing conviction. The government used the petitioner having failed to exhaust the challenge to the immigration judges, finding that his manufacturing conviction is an illicit trafficking offense. However, the board expressly, although it's cited matter of Burbano, as your honors pointed out in the BB, the board is permitted in even a matter of Burbano site to say we're adopting the VIJ's decision in whole, except for this particular part, as expressly stated. The board did that here. So I believe the board found that petitioner failed to exhaust and therefore waived before the board that manufacturing is an illicit trafficking crime. However, the board also found that the manufacturing conviction is a drug trafficking crime in the first instance, which it was permitted to do because that is a legal issue. And we believe therefore that that issue is properly before the court and petitioner's challenge is before the court in that respect. So I'd like to address that manufacturing in California is an illicit, excuse me, a drug trafficking crime under the INA. And the drug trafficking route, it provides for analysis where you compare the California statute to its federal analog. And here the federal analog is 21 USC 841A. And the question is, okay, you compare the elements, you line up the elements and see if they match between the California statute and the federal. Starting with the first element, it's undisputed that the prohibited acts in California are the same as the prohibited acts in the federal statute. Going to the second step, it's also disputed that the California manufacturing statute is overbroad and divisible and that the Shepard documents in this case established that methamphetamine is the underlying drug. And it's undisputed that methamphetamine is federally controlled. So that second step is met. And that brings us to the third step, which is whether the scienter element between the California manufacturing statute and the federal statute match. And the government argues that this court has already decided that issue in Verdusco-Rangel, albeit a different context, but the analysis applies equally here. In that case, the court said that the illicit trafficking route of the INA doesn't have a scienter requirement. But if it did, there would be a match between the California drug statute and the INA provision because both federal and California law require that the defendant have knowledge of the illicit nature of the drug in the respective jurisdiction. And that third element is really about the culpability of the defendant. The scienter, it's not about matching up the knowledge to the specific drug on the schedule. That's just not- In other words, the government believes that this is a categorical match. We don't have to go to modify category. Correct, and because manufacturing is an aggravated felony and petitioner received a five-year sentence for that conviction, it's also a per se, particularly serious crime. And therefore, the agency properly terminated petitioner's prior withholding grant, properly found him removable, as well as ineligible for asylum and withholding for a particular serious crime. Unless your honors would like me to address the possession for sale of a controlled substance conviction as an aggravated felony, I will turn to Kat then, your honors. The government argues that the record evidence does not compel reversal. That the record evidence does not compel the finding that petitioner established a clear probability of future torture by or with the consent or acquiescence of the Jordanian authorities. I want to start off by noting that the only piece of individualized risk of torture that petitioner has submitted is an email threat from an individual claiming to be from ISIS. That's the only individualized, particularized threat of torture that petitioner has received. There's also the threat from the family member that was particular to him, wasn't there? Well, our position is that that threat was not before the agency. It's not in the record in this proceeding. And the reason is, is that petitioner was, in 1999, provided an opportunity to testify supportive of his withholding or removal application. And in that proceeding, he testified about a threat from his cousin. That proceeding, he was granted withholding. 20 years later, the government reopened proceedings because he committed two serious drug trafficking crimes. And in those reopened proceedings, he was provided an opportunity to submit a new asylum application, provide as much testimony as he wanted. And he was specifically prompted, at least accounted 11 times, to describe why he fears returning to Jordan. And at no point in his asylum application or his testimony where he was repeatedly prompted by both the government and the immigration judge did he testify to this threat. And so it's just simply not, it wasn't before the agency and it's not before the court. So in other words, from the government's perspective, even though this was once involved with, I guess it was withholding, the reality is he was prompted several times to basically re-articulate those threats and he didn't do so. So the only threat that was before the IJ in this case was the alleged threat from ISIS. Is that correct? Correct. Essentially these were reopened brand new proceedings where he was provided ample opportunity to present his case. And so what we're left with is a single email threat, which was four years ago. Petitioner has not heard from ISIS or gotten any other threats. There's also no evidence that anyone in Jordan is interested in his whereabouts or are interested in harming him upon his return. And I'll note that this court in Rodriguez, Joran affirmed a cat denial in a case where the petitioner received two very credible threats. The first threat was from a leader of a group of assassins who was associated with El Chapo, who called the petitioner and threatened to kill him if he didn't participate in the drug trafficking scheme. Several days later, that same leader and several members of the group of assassins approached petitioner again. This time they were armed and they threatened to kill him if he didn't participate in the drug scheme. And this court found that that was insufficient. Those two threats, along with the country condition reports in Mexico, were insufficient to compel the finding that there was a clear probability of future torture. What case was that? This is Rodriguez, Joran. And I cite it in my brief. And the reasoning was that there was no, one, he didn't experience any past torture, which is exactly the case here. And two, there was no evidence that anyone remained interested in the petitioner several years later. So that's similar to our case. And I'll turn to the remaining evidence in the record, which is objective evidence regarding sort of the conditions for Christians and Christian converts. In terms of the state treatments of those individual, petitioner fears essentially interrogations and surveillance by the state. Of course, that conduct, while unfortunate, isn't sufficient to rise to the level of torture. He also fears consequences by the Sharia courts. But the Department of State report indicates that the consequences are civil in nature. There's family law consequences, inheritance rights consequences. And those certainly don't rise to the level of torture. And finally, there is some evidence that there are criminal prosecutions where individuals who convert from Islam to Christianity are prosecuted under anti-blasphemy laws. However, that is, that single piece of evidence, it's one article, is insufficient to compel reversal. Where petitioner failed to establish, it's more likely than not that each link in his hypothetical chain of events will happen. Where we have situations where something that's not illegal in our law is illegal under the criminal code of another country, we don't treat that as torture generally, do we? That's a criminal violation. I suppose there may be some exceptions, but if there's an anti-blasphemy law that would permit the state to convict someone of violating a criminal statute, would that be torture? Would that be a violation of CAT? No, Your Honor. Torture requires, it's extreme form of cruel and inhuman treatment that comes from the board's decision in JE. And prosecution alone wouldn't be sufficient. Petitioner would need to show that, one, there's a more likely than not chance that he will be prosecuted under that law. We don't have evidence that how frequently the anti-blasphemy laws are used to prosecute individuals who convert. So he hasn't established that link. He also would need to show that once prosecuted, he would be subject to a term of imprisonment. Again, we don't know what types of sentences these individuals receive. And then three, he would have to show that it's more likely than not that the Jordanian government would torture him once imprisoned. And petitioner's characterization of the record evidence as there being pervasive torture in Jordan is simply not the case. The Department of State report indicates that there were a little over 300 reports of torture in police stations, and that I believe there was less than 100 incidents of torture reported in prisons in Jordan. That certainly isn't the pervasive widespread torture that would compel reversal. And finally, turning to the private harm, petitioner hasn't established a particularized risk that private individuals will harm him to the level of torture, or that the Jordanian government would acquiesce. The country reports show that there's a good relationship between the Jordanian government and Christians. The Jordanian government allows nine Christians to serve in the parliament. There's 11 recognized Christian churches. There's evidence that Christians have equal access to government services and police as other citizens. And so while there is some- I'm not responsive to his point, which is not that, I mean, he's not saying he's going to be persecuted as a Christian per se, it's he's going to be persecuted on the basis of apostasy having converted from Islam to Christianity. I mean, do you have evidence of that? I mean, the sort of toleration of Christianity extends to people who have converted to it. Well, Your Honor, I would argue that the evidence, the country report evidence regarding the treatment of Christians doesn't make a distinction between born Christians and converts, it just says Christians. And so that evidence is certainly relevant to how Jordan would respond to an honor killing, for example. The only evidence that- there is evidence that the Jordanian government has, quote, permissive attitudes towards private harm of individuals who convert, but that evidence alone is insufficient to compel reversal in light of the other evidence of the positive treatment of Christians in Jordan. Unless Your Honors have any other questions. Any other questions? Government submits. I think not. Okay, thank you, Your Honors. Thank you. Counsel, you have a little time left. Your opponent thinks that you haven't borne your burden to show there is insufficient evidence on the Kat claim. What's your response to that? My response to that, Your Honor, is threefold. First, I think that the agency erred by excluding what the evidence that really was at the heart of my client's claim, which was the fact that he's been subject to multiple death threats. Now, it sounds like the government today is arguing that the first death threat was so distant that maybe it doesn't deserve a lot of weight, but that's very different from what the agency actually did. And so if this court, I believe that my client deserves to have this considered, even if this court thinks that the distance in time weighs against it, that goes to the weight and it should be involved in. So I would ask for a remand on this issue. I would also add that at AR-524 and in my client's brief before the BIA, he did mention the death threats from his family. At AR-524, he says that he will be harmed by his family and the BIA brief also states with precision that he was threatened by his cousins, that he would be killed for his apostasy. Let me just respond to two other sites that the government provided. I think that the Duran-Rodriguez case, I believe, I may be confused as to whether it's Rodriguez-Duran or Duran-Rodriguez, but in that case, it really did emphasize how there was no interest between an old death threat and the years that had passed since. This case is much more like Parada, where 24 years had passed between the death threat and subsequent events did make the fact that his fear of torture was still alive and well. And here, what I'm referring to is the more recent threat by a member of ISIS. Third, the government says that- That was, what, four years ago? Yes, Your Honor, but it was much closer to when the IJ actually made this decision. The final point, I see that my time is up. Thank you, Your Honor. My final point is that the government cites that there are only perhaps the instances of torture number only in the hundreds. In Cerati versus Holder, the government said that there were only somewhere around 16 honor killings, but that that in itself was substantial evidence. And so I would say that when we've got scores, hundreds of instances of torture, there is substantial evidence here, especially warranting a remand when the immigration said that there were no instances of violence that amounted to torture. And so I think at the very least, a remand is warranted. All right, thank you, Your Honor. Thank you, counsel. Thank you both for your argument. The case just argued is submitted.
judges: Fernandez, M. Smith, Miller